# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 24-1824C
(Filed: February 24, 2025[*])

|  |  |
|---|---|
| **RAYTHEON COMPANY**, | ) )  ) |
| *Plaintiff,* | ) ) |
| v. | ) ) ) |
| **UNITED STATES**, | ) ) ) |
| *Defendant,* | ) ) |
| and | ) ) |
| **NORTHROP GRUMMAN SYSTEMS CORP.**, | ) ) ) |
| *Defendant – Intervenor.* | ) ) |

*Jeffrey M. Lowry*, Vedder Price, PC, Washington, DC, for plaintiff. With him on the briefs were *Kevin P. Connelly*, *Kelly E. Buroker*, and *Michael P. Ols*, Vedder Price, P.C., Washington, DC.

*Reta E. Bezak*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With her on the briefs were *Brett A. Shumate*, Acting Assistant Attorney General, and *Patricia M. McCarthy*, Director, and *Douglas K. Mickle*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC. *Lieutenant Colonel Sean Zehtab*, Contract Litigation and Intellectual Property Division, U.S. Army Legal Services Agency, Fort Belvoir, VA, and *Brian J. Chapuran*, Associate General Counsel – Acquisition, Missile Defense Agency, Washington, DC, Of Counsel.

*Jason A. Carey* and *Kayleigh M. Scalzo*, Covington & Burling LLP, Washington, DC, for defendant-intervenor.

---

[*] This opinion was originally filed under seal on February 13, 2025. The Court provided the parties an opportunity to review the decision for any proprietary, confidential, or other protected information and submit proposed redactions. On February 20, 2025, plaintiff proposed a series of redactions. Those adopted by the Court are denoted using "{redacted}."

# OPINION AND ORDER

***BONILLA,*** *Judge*.

      Through this action, this Court is again called upon to determine the scope of its jurisdictional authority to adjudicate bid protests involving "other transactions" awarded by the U.S. Department of Defense (DOD) under 10 U.S.C. §§ 4021–22. In an effort to break the Sisyphean cycle, the undersigned examines the history and purpose of these statutes, their intersect with the Administrative Dispute Resolution Act (ADRA), Pub. L. No. 104–320, § 12, 110 Stat. 3870, 3874–75 (1996) (codified at 28 U.S.C. § 1491(b)(1)), and the developing caselaw, with an eye toward articulating a predictive forum selection standard for challenging these ill-defined and oft-evolving prototype projects. At a minimum, this opinion may streamline the litigation of these jurisdictional issues in future cases, until such time as Congress or the United States Court of Appeals for the Federal Circuit is presented with the appropriate opportunity to resolve the issue or provide critical guidance in navigating this space. Perhaps this case will serve that purpose.

      Until then, consistent with the broad authority statutorily vested in this Court to entertain challenges to the procurement decisions of federal agencies and instrumentalities, the undersigned concludes that this Court is the de facto forum for bid protests involving "other transactions" (OTs) and "other transaction agreements" (OTAs) awarded under 10 U.S.C. §§ 4021–22. The annual award of billions in taxpayer dollars cannot evade judicial scrutiny, nor be returned to the whims of tactical forum shopping. Congress intended neither. While there may well be limited exceptions to the general rule announced today, the case presented is not one of them. The military defense project in issue easily falls within the Court's bid protest jurisdiction under the Tucker Act, 28 U.S.C. § 1491(b)(1). The government's standing challenge and administrative exhaustion argument, in turn, similarly fall short. Accordingly, defendant's motion to dismiss must be denied.

## BACKGROUND[1]

      Through the Fiscal Year 2017 National Defense Authorization Act (FY 2017 NDAA), Congress tasked the DOD Missile Defense Agency (MDA) with developing missile defense capabilities, to include weapons capable of detecting and intercepting

---

[1] In resolving defendant's motion to dismiss, the facts are largely drawn from plaintiff's complaint and attached exhibits, corroborating agency proceedings appended to defendant's dispositive motion (referenced in plaintiff's complaint), and undisputed publicly available information. *See Bitscopic, Inc. v. United States*, 166 Fed. Cl. 677, 696 (2023) ("The court is not limited to the pleadings to assure itself of its jurisdiction; it may 'inquire into jurisdictional facts' to confirm jurisdiction.") (quoting *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)); *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (In evaluating a complaint for sufficiency under RCFC 12(b)(6), the court is "not limited to the four corners of the complaint. [The court] may also look to 'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'") (citations omitted).

2

hypersonic and intercontinental ballistic missiles during their glide phase.[2]  *See* Pub. L. No. 114-328, § 1687, 130 Stat. 2000, 2629–30 (2016).  In response to the congressional mandate, the MDA issued a Special Topic Broad Agency Announcement (BAA) titled Enhanced Hypersonic Defense on April 12, 2021, seeking concept white papers on basic and applied research related to the development of a new Glide Phase Interceptor (GPI).  More specifically, the MDA sought "innovative concepts that provide affordable, reliable, high capacity, robust capability defending against regional hypersonic threats during the glide phase of flight and other advanced threats."  ECF 1-2 at 7.  Limited to the research and development phase, the BAA noticed a possible follow-on production contract for successful participants:

> For any OT awarded [in accordance with] 10 U.S.C. § [4022], the Government may award a follow-on production contract or OT for any OT awarded under this BAA if: (1) that participant in the OT, or a recognized successor in interest to the OT, successfully completed the prototype project provided for in the OT, as modified; and (2) the OT provides for the award of a follow-on production contract or OT to the participant, or a recognized successor in interest to the OT.

ECF 1-2 at 8.

Based upon the white papers submitted, on November 19, 2021, the MDA awarded OTAs for Phase I: Materiel Solutions Analysis to three defense contractors, including Northrop Grumman Systems Corp. (Northrop Grumman) and Raytheon Co. (Raytheon).  The awardees were reduced to two on June 24, 2022, after a third defense contractor was eliminated.  Throughout this phase of the GPI Program, the MDA requested successive proposals based on awarded and option agreement line-item numbers (ALINs) as outlined in Article 6 of the OTAs, titled Option Exercise to Continue Performance.  *See* ECF 31-2 at 76–77.  Article 6 noted the MDA's "unilateral discretion to continue performance (subsequent option exercises) or discontinue performance (options not exercised)."  *Id.* at 76.  ALIN awards hinged, in part, on continued compliance with the top-level requirements of design and projected performance.  The MDA initially sanctioned two proposed technological solutions: aeroshell breakup (a/k/a blast fragmentation) and payload defeat (a/k/a warhead neutralization or, more colloquially, "hit-to-kill").  According to Raytheon, its aeroshell breakup approach is relatively easier to achieve, faster to develop, and

---

[2] "Hypersonic weapons fly at speeds of at least Mach 5 and are highly maneuverable and able to change course during flight. They are different from ballistic missiles, which can also travel at hypersonic speeds (of at least Mach 5) but have set trajectories and limited maneuverability." *See* Jeff Seldin, *What Are Hypersonic Weapons and Who Has Them?*, Voice of America News (Mar. 22, 2022, 12:08 PM), *available at* https://perma.cc/B9HZ-V2NP (last visited Feb. 12, 2025). During the "glide phase," hypersonic missiles separate from their rocket boosters, reenter the atmosphere, and are capable of evasive maneuvers while traveling at high speed toward their intended targets. *See* Center for Arms Control and Non-Proliferation, *Fact Sheet: Hypersonic Weapons* (Nov. 15, 2023), *available at* https://perma.cc/69D8-DVRU (last visited Feb. 12, 2025).

cheaper to produce, but is naturally more likely to produce hazardous debris than payload defeat.  In contrast, Northrop Grumman's payload defeat approach is highly technical, harder (if not improbable) to achieve, and will require significantly more time to demonstrate proof of concept.  The reason: Raytheon's approach is to disable the missile by {redacted}, whereas Northrop Grumman's approach is to destroy the missile by essentially hitting a (hypersonic) bullet with another bullet.

In mid-FY 2023, the MDA launched Phase II: Technology Development, slated to continue into FY 2029, with a cost estimate exceeding $2.5 billion.  This phase—the precursor to Phase III: Product Development—focuses on building and testing the hardware and software for potential prototypes (i.e., GPI missile and weapon systems development, systems engineering and integration).  As memorialized in the MDA's April 3, 2023 Acquisition Plan for the GPI Program:

> The missile development during the [Product Development] phase will be accomplished with only one missile concept. However, if technical merit and funding permit, competition may continue into the [Product Development] phase with more than one offeror design. The planned contract structure to be used during this phase is under review. The [MDA] will pursue a strategy that will ensure maximum flexibility coupled with the ability to deliver the capability at optimal cost.

ECF 31-2 at 39.  Both Northrop Grumman and Raytheon proceeded to participate in the Technology Development phase.

Responding to increased interest and supplemental appropriations from Congress, the MDA issued a Request for Prototype Proposal (RPP) on May 1, 2024, intended to complete the Phase II deliverables identified as Option Period 2C+ (Technical Maturation).  Comprised of six base ALINs addressing GPI technical development, expected milestones, and hypothetical timing and budgetary constraints, and a funding limit of nearly $650 million, this period of performance is projected to be completed by September 30, 2030.  *See generally* ECF 1-2 at 112–19.  Two weeks later, the MDA finalized negotiations and signed a cooperative development agreement with the Japan Ministry of Defense.  Under the bilateral agreement, Japan took the lead in developing the GPI rocket motors and propulsion components.  Notwithstanding this new partnership, the MDA did not modify the May 1, 2024 RPP.  Relevant here, the Japan Ministry of Defense reportedly expressed a preference for Northrop Grumman's payload defeat over Raytheon's aeroshell breakup.  In response, the MDA asked Raytheon to submit payload defeat capability data.  Although Raytheon's solution is reportedly capable of payload defeat, as explained above, the company's design focuses on disabling rather than destroying its target.  As such, particularly given the short response time, Raytheon represents that the submitted data—based on simulation modeling and algorithms developed for a different solution—does not capture the company's true capabilities.

On September 25, 2024, the MDA decided to continue Northrop Grumman's technical development work under Option Period 2C+ and discontinue Raytheon's participation in the GPI Program altogether. In support, the MDA cited "a lack of confidence in the ability of [Raytheon's] design to meet not only US but also Japan warfighter needs as indicated through the identified concerns, including: . . . The lethality of [Raytheon's] design against current and future threats . . . ." *Id.* at 142–43. Presumably, this is a reference to the expressed preference for payload defeat over aeroshell breakup. The MDA's contemporaneously issued press release further explained:

> The [MDA], in coordination with our international partner the Japan Ministry of Defense [], will proceed with Northrop Grumman [] to continue development of the Glide Phase Interceptor (GPI). . . .
>
> Northrop Grumman will continue to perform under its existing Other Transaction Agreement (OTA). This effort is *expected to lead to a follow-on development and production contract* in support of achieving the Department of Defense priority requirement of developing integrated layered defeat capabilities to degrade adversaries' hypersonic weapons.

*Id.* at 124 (emphasis added). Relating the history of the GPI program, the MDA closed the press release noting: "MDA has continued the technology maturation of . . . two GPI concepts up until today's announcement. This decision allows MDA and Japan [Military of Defense] to focus on a solution that meets costs, schedule and performance requirements." *Id.*

Notwithstanding the foregoing, during the requested "out brief" conducted on October 22, 2024, MDA officials reportedly represented to Raytheon: "Payload defeat is not the only acceptable outcome of an intercept under MDA's requirements," and that aeroshell breakup continued to serve as an "acceptable kill mechanism[]." *Id.* at 40. The MDA further explained that other concerns—such as the increased risk of "hazardous debris entry into a defended area"—contributed to the decision to discontinue Raytheon's participation in the GPI Program. *Id.* at 40, 41; *accord id.* at 42 ("Consideration of the amount of hazardous debris impacting a defended area is implicit in the intent behind a defensive system.").

Raytheon filed this bid protest on November 6, 2024, seeking to challenge the MDA's decision to move forward with Northrop Grumman in Option Period 2C+ and discontinue Raytheon's participation in the GPI Program. Raytheon claims the MDA improperly evaluated both companies' proposals using unstated selection criteria (i.e., preferred payload defeat solution, hazardous debris minimization), decremented Raytheon's proposal based on perceived cost risk without subjecting Northrop Grumman's proposal to similar scrutiny, and ignored Congress' directive that the agency "achieve . . . initial operation capability for the Glide Phase Interceptor . . . not later than December 31, 2029." *See* FY 2024 NDAA, Pub. L. No. 118-31, § 1666,

5

137 Stat. 606 (2023).  Raytheon alternatively asserts that MDA officials breach an implied-in-fact contract to fairly consider the defense contractor's proposal.[3]

## DISCUSSION

### I. Standard of Review

This Court's statutorily prescribed jurisdiction to adjudicate claims and grant relief requires an affirmative waiver of sovereign immunity.  *United States v. Testan*, 424 U.S. 392, 399 (1976).  When the Court's authority to entertain a cause of action is challenged or otherwise called into question under RCFC 12(b)(1), the onus is on plaintiff to present preponderant evidence that jurisdiction is proper.  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  In evaluating the jurisdictional propriety of a claim, the Court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Catawba Indian Tribe v. United States*, 982 F.2d 1564, 1568–69 (Fed. Cir. 1993)).

In turn, when considering a motion to dismiss for failure to state a claim under RCFC 12(b)(6), courts "must accept as true all the factual allegations in the complaint and . . . indulge all reasonable inferences in favor of the non-movant."  *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted).  "A trial court should not dismiss a complaint for failure to state a claim unless it is beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Id.* (quotation marks omitted) (quoting *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989)).  Assertions of legal conclusions are not credited during this assessment, and the complaint must include nonconclusory factual allegations setting forth a plausible–as opposed to merely a conceivable–claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

### II. Tucker Act

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. 104–320, § 12(a)–(b), 110 Stat. 3870, 3874 (1996), amended the Tucker Act, 28 U.S.C. § 1491, to vest this Court with concurrent subject matter jurisdiction to adjudicate pre- and post-award bid protests:

> Both the Unite[d] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed

---

[3] In light of today's decision, the Court does not address Raytheon's alternative claim for relief.

6

procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1).[4] By operation of the five-year sunset provision included in the ADRA, Congress terminated the jurisdiction of federal district courts over bid protest actions effective January 1, 2001. Pub. L. No. 104–320, § 12(d), 110 Stat. at 3875. In conferring exclusive jurisdiction over these cases in this Court, Congress sought "to develop a uniform national law on bid protest issues and end the wasteful practice of shopping for the most hospitable forum." *See* 142 CONG. REC. S6155-01, S6156, 1996 WL 315422 (daily ed. June 12, 1996) (statement of Sen. William Cohen); *accord* H.R. Conf. Rep. No. 104–841, at 10 (1996) ("It is the intention [of Congress] to give the Court of Federal Claims exclusive jurisdiction over the full range of procurement protest cases previously subject to review in the federal district courts and the Court of Federal Claims."), *quoted in AFGE*, 258 F.3d at 1300; *see Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir. 2001) ("[T]o prevent forum shopping and to promote uniformity in government procurement award law, Congress sought to channel the entirety of judicial government contract procurement protest jurisdiction to the Court of Federal Claims.").

The Tucker Act sets forth three avenues for a qualified "interested party" to invoke this Court's bid protest jurisdiction: "objecting to [1] a solicitation by a Federal agency for bids or proposals for a proposed contract or to [2] a proposed award or the award of a contract or [3] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." *Percipient.ai, Inc. v. United States*, 104 F.4th 839, 846 (Fed. Cir.) (quoting 28 U.S.C. § 1491(b)(1)) (emphasis omitted), *vacated and reh'g en banc granted*, 121 F.4th 1311 (Fed. Cir. 2024). The concluding phrase "in connection with a procurement or proposed procurement" applies to each jurisdictional prong, giving this Court "broad" authority "over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement." *See Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (citation omitted).

"The Tucker Act does not define the terms 'procurement' or 'proposed procurement.'" *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008). To fill in this statutory gap, the Federal Circuit turned to the definition currently found in 41 U.S.C. § 111: "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." *See* 539 F.3d at 1345–46

---

[4] Prior to the ADRA's enactment, this Court's jurisdiction extended only to pre-award bid protest, whereas jurisdiction over post-award bid protests was vested in federal district courts. *See Am. Fed'n of Gov't Emps., AFL-CIO v. United States* (*AFGE*), 258 F.3d 1294, 1297–98, 1300 (Fed. Cir. 2001) (citing *Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970)).

("We conclude that it is appropriate to adopt this [statutory] definition to determine whether a 'procurement' [(actual or proposed)] has occurred pursuant to § 1491(b).") (citing 41 U.S.C. § 403(2) (currently codified at 41 U.S.C. § 111)).  Circling back to the intended scope of these provisions, the Federal Circuit has further explained that "[t]he operative phrase 'in connection with' is very sweeping in scope," and "covers a broad range of potential disputes arising during the course of the procurement process."  *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999); *Sys. Application & Techs.*, 691 F.3d at 1380–81.  In *Distributed Solutions*, for example, the appellate court concluded that an agency's pre-procurement market research—"used . . . to determine the scope of services required by the government" and then added to an existing contract rather than purchase from a new vendor—fell with the jurisdictional definition of "proposed procurement."  539 F.3d at 1346.

Defining the contours of this Court's bid protest jurisdiction under the Tucker Act also requires consideration of procurement-related definitions codified in the Federal Grant and Cooperative Agreement Act (FGCAA), Pub. L. No. 95-224, 92 Stat. 3 (1978) (codified at 31 U.S.C. §§ 6301 *et seq*.).  *See Hymas v. United States*, 810 F.3d 1312, 1326–27 (Fed. Cir. 2016).  The FGCAA instructs on the appropriate uses of procurement contracts, grant agreements, and cooperative agreements, reflective of the specific relationship between the federal government and the recipient entity.  *Id.* at 1327.  Relevant here, a "procurement contract" is meant for situations where "the principal purpose of the instrument is to *acquire* . . . property or services for the direct benefit or use of the United States Government . . . ."  31 U.S.C. § 6303(1) (emphasis added).  In contrast, a "grant agreement" is designed for the *transfer* of property in exchange for performing a public service at the behest of the federal government and in its stead.  *Id.* § 6304; *e.g.*, *Purpose Built Fams. Found. v. United States*, 167 Fed. Cl. 714, 718 (2023) ("[T]he [Supportive Services for Veterans Families (SSVF)] agreements were not for the direct benefit of the United States government.  The applicable statutory and regulatory provisions provide that the purpose of the agreements is to facilitate supportive services to low-income veteran families.") (citing 38 U.S.C. § 2044(a)).  Finally, a "cooperative agreement" similarly involves the *transfer* of property, but to perform a public service in cooperation with a federal agency.  31 U.S.C. at § 6305; *e.g.*, *Hymas*, 810 F.3d at 1327–28 (cooperative farming agreements executed pursuant to 16 U.S.C. §§ 661 *et seq.* designed to manage public lands and conserve wildlife in the National Wildlife Refuge System).[5]  Additional limits can be found in the context of federal leases, which involve the letting of government-owned land rather than a federal agency's acquisition of goods and services.  *See Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010).

---

[5] As discussed *infra*, the OTA statutes define "other transactions" in the negative: "transactions []*other than* contracts, cooperative agreements, and grants."  10 U.S.C. § 4021(a) (emphasis added).  Context strongly suggests that the use of "contracts" within the OTA statutes is a reference to "procurement contracts" as that term is used in the FGCAA given the overlapping trilogical characterizations.

8

### III.  Other Transactions

#### A.  History

Congress first sanctioned the use of amorphous "other transactions" in 1958, to assist the United States and National Aeronautics and Space Administration (NASA) in winning the Space Race during the Cold War.  Through the National Aeronautics and Space Act of 1958, Congress authorized NASA

> to enter into and perform such contracts, leases, cooperative agreements, *or other transactions as may be necessary* in the conduct of its work and on such terms as it may deem appropriate, with any agency or instrumentality of the United States, or with any State, Territory, or possession, or with any political subdivision thereof, or with any person, firm, association, corporation, or educational institution.

Pub. L. 85-568, § 203(b)(5), 72 Stat. 426, 430 (1958) (emphasis added).  Three decades later, Congress extended the authorized use of "other transactions" to DOD: first, in 1989, for research projects and then, in 1994, for the development of prototypes. *See* 10 U.S.C. § 2371 (research projects) (current version at 10 U.S.C. § 4021); 10 U.S.C. § 2371b (prototype projects) (current version at 10 U.S.C. § 4022). According to the Government Accountability Office (GAO), as of January 2016, nearly a dozen federal agencies (and certain components and programs) enjoy the administrative flexibility associated with executing OTAs in lieu of traditional contracts, cooperative agreements, and grants "to help meet project requirements and mission needs."[6]

DOD's other transaction authority is codified at 10 U.S.C. §§ 4021 and 4022. Section 4021 provides: "The Secretary of Defense and the Secretary of each military department may enter into transactions (other than contracts, cooperative agreements, and grants) under the authority of this subsection in carrying out basic, applied, and advanced research projects."  10 U.S.C. § 4021(a).  This provision notes that this authority is in addition to DOD's authority to use traditional contracts, cooperative agreements, and grants to accomplish this work under § 4001.  *See id.* Section 4022, in turn, extends DOD's other transaction authority to "carry out prototype projects that are directly relevant to enhancing the mission effectiveness of personnel of [DOD] or improving platforms, systems, components, or materials

---

[6] *See* GAO No. 16-209, *Federal Acquisitions: Use of "Other Transaction" Agreements Limited and Mostly for Research and Development Activities* (Jan. 7, 2016), *available at* https://perma.cc/MY8P-TV7E (last visited Feb. 12, 2025).  In addition to NASA and DOD, the list of authorized federal agencies and their respective components and programs include: the Department of Energy and its Advanced Research Projects Agency; the Department of Health and Human Services and certain programs within the National Institutes of Health; the Department of Homeland Security and its Transportation Security Administration and Domestic Nuclear Detention Office; and the Department of Transportation and its Federal Aviation Administration.  *See id.* (full report).

proposed to be acquired or developed by [DOD], or to improvement of platforms, systems, components, or materials in use by the armed forces." *Id.* § 4022(a).

As succinctly explained by this Court:

> Congress granted the military OT authority under 10 U.S.C. §§ 4021–4022 to provide a more flexible method to facilitate research, development, and prototyping than via traditional procurement contracts. *See* S. Rep. No. 106-292, § 807, at 324, 114 Stat. 1030 (2000) ("[I]t is imperative that [DOD] continue to have the flexibility to use innovative contractual instruments that provide access to [commercial] technology."). The flexibility of OT agreements derives from them not being subject to the federal statutes and regulations applicable to other types of agreements, including the Federal Acquisition Regulation (FAR). *See* 32 C.F.R. § 3.2.[7] This flexibility potentially allows for a faster acquisition process, thereby attracting companies to do business with [DOD] when they otherwise might forego opportunities due to bureaucratic obstacles. Heidi M. Peters, Cong. Rsch. Serv., *DOD Use of Other Transaction Authority: Background, Analysis, and Issues for Congress* (Feb. 22, 2019). Indeed, Congress viewed OT authority as providing "an important acquisition tool" for the military to help "facilitate the incorporation of commercial technology" into its programs. S. Rep. No. 106-292, at 324; *see also* Peters, Cong. Rsch. Serv. 32 (Congress believed that "OTs could support DOD's effort to access new sources of technological innovation . . . .").

*Indep. Rough Terrain Ctr., LLC v. United States* (*IRTC*), 172 Fed. Cl. 250, 257 (2024) (cleaned-up). As illustrated in the table below, in recent years, DOD's exercise of its OT authority has increased nearly ten-fold in use and five-fold in value.

| Fiscal Year | Other Transactions | Total Value (in billions) |
|---|---|---|
| 2017 | 496 | $2.20 |
| 2018 | 808 | $3.98 |
| 2019 | 1,702 | $7.38 |
| 2020 | 3,234 | $16.02* |
| 2021 | 4,086 | $14.29 |
| 2022 | 4,391 | $10.70 |

*FY 2020 included a significant spike in spending due to COVID-19.

---

[7] Title 32, Code of Federal Regulations, Section 3.2 provides:

> "Other transactions" is the term commonly used to refer to the 10 U.S.C. [§] 2371 authority to enter into transactions other than contracts, grants or cooperative agreements. "Other transactions" are generally not subject to the Federal laws and regulations limited in applicability to contracts, grants or cooperative agreements. As such, they are not required to comply with the [FAR] and its supplements [under Title 48].

32 C.F.R. § 3.2.

In FY 2022, moreover, nearly two-thirds of DOD's OTA awards involved or otherwise provided for the option of a follow-on production contract.[8]

B. Judicial Review

"There is a strong but rebuttable presumption of judicial review of agency action. The presumption is overcome 'when a statute's language or structure demonstrates that Congress wanted an agency to police its own conduct.'" *IRTC*, 172 Fed. Cl. at 257 (quoting *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486 (2015) (citing *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)). Federal agencies bear a "heavy burden" in successfully rebutting this presumption. *Mach Mining*, 575 U.S. at 486 (citation omitted). To this point, it is axiomatic that Congress knows how to exempt government actions from judicial review. *See, e.g.*, 5 U.S.C. § 704 (Administrative Procedures Act (APA) provision exempting non-final agency actions from judicial review); Commandos Compensation Act, Pub. L. No. 104–201 § 657(j), 110 Stat. 2422, 2584 (1996) ("NO RIGHT TO JUDICIAL REVIEW.—All determinations by the Secretary of Defense pursuant to this section are final and conclusive, notwithstanding any other provision of law. Claimants under this section have no right to judicial review, and such review is specifically precluded."), *quoted in Mattes v. Chairman, Vietnamese Commandos Comp. Comm'n*, 173 F.3d 817 (11th Cir. 1999) (per curiam). This principle extends to the bid protest context. *See, e.g.*, 10 U.S.C. § 3406(f)(1) (limiting scope of judicial review of military task and delivery orders); 41 U.S.C. § 4106(f)(1) (same for general executive agency task and delivery orders).

Nothing in the statutory scheme or legislative history behind the grant of OT authority suggests that Congress intended to exempt awards under these contracting vehicles from judicial scrutiny. The government does not contend otherwise. Rather, the government generally seeks to present OTA awardees (and prospective awardees) with a binary choice: seek injunctive relief through an APA challenge to the agency action in federal district court or file a breach of contract claim in this Court under the Contract Disputes Act, 41 U.S.C. §§ 7101–09, where relief is largely limited to monetary damages.[9] In support of exempting this class of contracting vehicles from this Court's bid protest jurisdiction under the Tucker Act, defendant argues that OT awards do not qualify as "a solicitation . . . for bids or proposals for a proposed

---

[8] Office of the Under Secretary of Defense for Acquisition and Sustainment, *Report to Congress on the Use of Other Transaction Authority for Prototype Projects In FY 2022*, at 3, 8 (Apr. 2023).

[9] One caveat to the government's position involves a bid protest challenge to the agency's decision to employ the OT vehicle, which defendant concedes may be filed before the GAO or this Court. *See In re MD Helicopters, Inc.*, No. B-417379, 2019 WL 1505296, *2 (Comp. Gen. Apr. 4, 2019) ("Absent any allegation . . . that the Army is improperly using its statutory OTA authority to acquire goods or services that should be acquired via a procurement contract, we have no jurisdiction over [the] protest."); *but see In re ARiA*, No. B-422365, 2024 WL 2746965, at *2, 3–4 (Comp. Gen. May 28, 2024) (GAO exercised jurisdiction over bid protest to Phase I of Army technology solution competition where the announcement cited 10 U.S.C. § 4022 as one of three authorities for the procurement; critical to the GAO's jurisdictional assessment was the likely award of a follow-on contract to the Phase III winner); Tr. at 7–9 (Jan. 14, 2025) (discussion of caveat) (ECF 55).

11

contract," "a proposed award or the award of a contract," or otherwise "in connection with a procurement or a proposed procurement," as required under 28 U.S.C. § 1491(b). The Court rejects defendant's narrow and oversimplistic view of OT awards for the sake of judicial expediency in drawing jurisdictional boundaries.

Five years ago, this Court decided *Space Exploration Technologies Corp. v. United States* ("*SpaceX*"), involving a post-award bid protest of OTAs awarded by the Air Force to facilitate commercial development of space launch systems. 144 Fed. Cl. 433, 434–37 (2019). Specifically, SpaceX sought to challenge its non-selection for the prototype development phase of a DOD project, wherein the Air Force was offering seed money for the development of space launch vehicles that, if proven, could serve both the private and public sectors. *Id.* Reminiscent of the Cold War, the government sought to create a domestic market to end the United States' reliance upon Roscosmos spacecraft.[10] If successful, the Air Force planned to procure off-the-shelf space launch services from the newly created market of domestic suppliers. 144 Fed. Cl. at 437–38.

Acknowledging the broad jurisdictional authority intentionally vested in this Court to hear bid protest challenges to the wide array of procurement decisions made by federal agencies and instrumentalities, the *SpaceX* decision stands for the notion that the Tucker Act is not without limits. To reach this conclusion, the court first determined that the OTAs in issue were not procurement contracts and that the Air Force solicitation was not a procurement. *Id.* at 442. In support, the *SpaceX* court likened the prototype development agreements to cooperative farming agreements, which fall outside our bid protest jurisdiction. *Id.* at 441, 442 (citing *Hymas*, 810 F.3d at 1320, 1329–30). The court then focused on whether the Air Force's evaluation of prototype proposals and award of prototype development agreements were "'in connection with a procurement or proposed procurement,' as contemplated by the Tucker Act." *Id.* at 442 (citations omitted). Answering this question in the negative, the *SpaceX* court distinguished between agency decisions made "in connection with" a procurement and those more broadly "related to" a procurement, highlighting three factors: (1) the "separate and distinct" nature of the solicitations seeking prototype development versus the possible procurement from the market created; (2) the different acquisition strategies to be employed (i.e., OTA versus FAR-based contract); and (3) the prototype development agreements awarded "did not involve the procurement of any goods or services by the Air Force." *Id.* at 442–44. The court further noted that although SpaceX might be at a disadvantage for not having participated in the launch vehicle prototype development phase of the commercial market generating exercise, the anticipated space launch services would be procured through full and open competition. *Id.* at 444–45. Pointedly limiting its jurisdictional conclusion to the unique facts presented, *see id.* at 442 n.4, the *SpaceX*

---

[10] *See* Konstantin Sergeyev, *The End of an Era: US Prepares to Sever Space Ties with Russia Threatening Roscosmos's Future*, The Insider (July 2, 2024), *available at* https://perma.cc/6RK6-FJPL (last visited Feb. 12, 2025).

court transferred the case to the United States District Court for the Central District of California under 28 U.S.C. § 1631.[11] *Id.* at 445–46.

Since then, courts have been presented with several opportunities to revisit the jurisdictional issues addressed in *SpaceX*. Each time, the court has either distinguished the OTAs in issue or declined to extend the conclusion reached beyond the seemingly unique factual scenario addressed. In the aftermath of this Court's decision in *SpaceX*, for example, the United States District Court for the District of Arizona was presented with the opposite scenario: a plaintiff brought an ostensible bid protest in federal district court under the APA, challenging the Army's award of OTAs for the design and development of next-gen military helicopters. *See MD Helicopters Inc. v. United States*, 435 F. Supp. 3d 1003, 1006–07 (D. Ariz. 2020). Distinguishing the challenged agency action from the scenario presented in *SpaceX*, outlined *supra*, the district court focused on the direct link between the down-select process adopted by the Army, wherein the anticipated follow-on procurement contract to be awarded would be limited to the pool of successful prototype program participants. *Id.* at 1012–13. Upon these grounds, the district court concluded that the case fell within the exclusive jurisdictional province of this Court in accordance with the ADRA.[12] *Id.*

In *Kinemetrics, Inc. v. United States*, the court summarily rejected the application of *SpaceX* to a post-award bid protest challenging the Air Force's award of an OTA to acquire seismic equipment to monitor nuclear proliferation treaty compliance. 155 Fed. Cl. 777, 780–81 (2021). Examining the substance over form of the procurement vehicle employed, the court highlighted that the solicitation "invited '[i]nterested parties [to] submit a complete technical and cost proposal[,]'" rather than simply announce "'a call for white papers[.]'" *Id.* at 782. The court was further struck by the language used in rejecting plaintiff's proposal: reportedly deeming it "technically acceptable" but not worthy of "a contract award." *Id.* at 783, 785. Noting the direct connection between the contested solicitation and the contract award, the *Kinemetrics* court held that the challenged agency action "was 'in connection with' a procurement," thus falling squarely within this Court's bid protest jurisdiction. *Id.* at 785.

A year later, this Court was again called upon to assess the jurisdictional boundaries of the Tucker Act in relation to OT bid protests. In *Hydraulics Int'l, Inc. v. United States*, a disappointed bidder filed a post-award bid protest challenging the Army's award of OTAs for the prototype development of military helicopter aviation ground power units (AGPUs). 161 Fed. Cl. 167, 171 (2022), *appeal dismissed*, No. 22-2287, 2023 WL 2729433 (Fed. Cir. Mar. 31, 2023). Iterating at the outset that Ots in

---

[11] Following transfer, the district court examined the certified administrative record and denied SpaceX's claims for relief under the APA standard of review. *SpaceX v. United States*, No. 19-7927, 2020 WL 7344615 (C.D. Cal. Sept. 24, 2020). The matter was subsequently dismissed.

[12] Prior to filing suit in district court, plaintiff filed a bid protest before the GAO, which dismissed the action on jurisdictional grounds. *See MD Helicopters*, 435 F. Supp. 3d at 1006–07. The district court did not transfer the case, nor was the matter refiled in this Court.

13

general "are not procurements," the *Hydraulics* court assessed whether the particular OTA in issue met the "connectivity to 'a procurement or a proposed procurement'" jurisdictional requirement of the Tucker Act. 161 Fed. Cl. at 176. Resolving this issue in the affirmative, the court explained that a guaranteed follow-on procurement contract is not a prerequisite to invoking this Court's bid protest jurisdiction. *Id.* at 176–77. Instead, the *Hydraulics* court focused on the critical fact that "every aspect of the [OT project] in this case is specifically tailored towards 'determining' the Army's 'need for property—upgraded AGPUs.'" *Id.* at 177–78. Distinguishing the case from *SpaceX*, the court concluded that the challenged agency action "fits squarely within the first 'stage of the federal contracting acquisition process[,]'" qualifying as "in connection with a procurement or a proposed procurement." *Id.* (citing *Distributed Sols.*, 539 F.3d at 1346).

The Court's most recent entrée into this jurisdictional quagmire came in *IRTC*, when the Court was called upon to adjudicate a pre-award bid protest challenging a follow-on production contract for next-gen military vehicles issued by the Army under its OT authority. 172 Fed. Cl. at 253. Breaking from the Court's previous decisions, outlined *supra*, the *IRTC* court suggested that pre-production OTAs may qualify as "procurements" as opposed to being limited to considered as "in connection with a procurement or a proposed procurement." *Id.* at 258. The court explained that the relevant jurisdictional inquiry requires looking beyond the label of the contracting vehicle to determine whether the government was seeking to acquire actual property or services. *Id.* In *IRTC*, the conclusion was clear: through the solicited follow-on production contract, the Army was seeking property in the form of next-gen military vehicles as well as services in the nature of specified warranty services. *See id.* at 253, 259–60.

Synthesizing these decisions in an effort to develop an appropriate and more predictable jurisdictional framework does not require re-examining whether *SpaceX* was properly decided or should be expanded. Instead, the Court places the *SpaceX* decision at one end of the spectrum and *IRTC* at the other. To properly assess the jurisdictional divide simply requires an evaluation of the federal agency's immediate endgame. *SpaceX* involved an unorthodox arrangement where the government planned to seed the development of technology to be made generally available to the public and private sectors alike, creating a commercial market from which the government may later procure off-the-shelf services. In contrast, in *MD Helicopters*, *Kinemetrics*, *Hydraulics Int'l*, and *IRTC*, the government charted a more direct and interlinked path from research, to development, to production, to government purchase.

Against this backdrop, the undersigned proffers the following working definition of OTs and OTAs falling within this Court's exclusive bid protest jurisdiction under the Tucker Act: an acquisition instrument other than a traditional procurement vehicle intended to provide the government with a direct benefit in the form of products or services. This definition satisfies the jurisdictional hook of "procurement solicitations and contracts" required under the Tucker Act. *See Res. Conservation*, 597 F.3d at 1245 ("[I]t is clear . . . [§] 1491(b)(1) in its entirety is

14

exclusively concerned with procurement solicitations and contracts."). It further accounts for the critical divide between the government facilitating the creation or expansion of a commercial market for the general public from which a federal agency or instrumentality might someday purchase as in *SpaceX*, and the government seeking to acquire a specific product or service and directing or otherwise facilitating its generation and production as in *MD Helicopters*, *Kinemetrics*, *Hydraulics Int'l*, and *IRTC*. *Cf. Hymas*, 810 F.3d at 1328 ("The cooperative farming agreements (CFAs) cannot be construed as procurement contracts because the agency did not intend to acquire farming 'services' for the 'direct benefit or use of the United States Government.'" (quoting 31 U.S.C. § 6305(1)). The undersigned now endeavors to take this new jurisdictional model—assembled using parts manufactured from cases involving space and military prototype vehicles and technologies—out for its inaugural test drive.

## IV. Raytheon's Bid Protest

### A. Jurisdiction

The OT authority exercised by the MDA in this case, and the OTAs awarded and then extended for Northrop Grumman but simultaneously discontinued for Raytheon, fall squarely within the working jurisdictional framework adopted today. The invitation to participate in the GPI Program and continue working through the research and development phase toward the production and delivery phase was carried out through an acquisition instrument other than a traditional procurement vehicle (i.e., procurement contract, cooperative agreement, or grant) intended to provide the government with a direct benefit in the form of products or services. As persuasively argued by Raytheon, the Option Period 2C+ award to Northrop Grumman (and non-award to Raytheon) thus meets the jurisdictional underpinnings of the Tucker Act. At a minimum, the MDA solicited proposals from the defense contractors "in connection with a procurement or a proposed procurement"—i.e., the development, production, and acquisition of a hypersonic missile defense system.

That the MDA had not yet formally committed to purchasing an end product from Northrop Grumman or any other successful prototype developer is not dispositive. *See Hydraulics Int'l*, 161 Fed. Cl. at 176–77 (guaranteed follow-on procurement contract to challenged OTA is not a prerequisite to Tucker Act bid protest jurisdiction). Rather, the invocation of this Court's jurisdictional authority to review a contested procurement is predicated on the agency's demonstrated intent, actions to date, and intentions moving forward. This is particularly true where, as here, the products or services to be developed and acquired are unique to the federal government and otherwise ill-suited for acquisition and use by the general public (i.e., hypersonic missile defense capabilities). *Compare SpaceX*, 144 Fed. Cl. at 435–37 (space launch vehicles capable of commercial and national security use), *with MD Helicopters*, 435 F. Supp. 3d at 1006–07 (military helicopters), *and Kinemetrics*, 155 Fed. Cl. at 780–81 (nuclear proliferation treaty compliance monitoring equipment), *and Hydraulics Int'l*, 161 Fed. Cl. at 171 (APGUs), and *IRTC*,

15

172 Fed. Cl. at 253 (military vehicles).  Further, as the MDA's actions and internal and external communications make clear, the government has every intention of awarding a follow-on production contract to Northop Grumman in the event the defense contractor's proposed solution is proven.

B. Standing

In invoking the Court's bid protest jurisdiction under the Tucker Act, the plaintiff bears the additional burden of demonstrating that they are an interested party. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009). To qualify, a party must be "'an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract.'" *AFGE*, 258 F.3d at 1302 (quoting 31 U.S.C. § 3551(2)), *quoted in Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  In post-award bid protests, the requisite direct economic interest is shown through credible allegations that the protestor had a "substantial chance" of award but for the claimed error.  *See id.* (citations omitted); *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) ("substantial chance" test to establish standing "is more lenient than [proving] actual causation" on the merits).  Raytheon satisfies this standard.

Prior to receiving notice that the MDA was discontinuing the company's participation in the GPI Program, Raytheon had been performing under the OTA at the center of this bid protest for nearly three years.  The crux of Raytheon's claims focuses on the federal agency's alleged improper independent and comparative evaluations of Raytheon's and Northrop Grumman's proposals, resulting in cascading award decisions that are arbitrary, capricious, an abuse of discretion, and contrary to law.  These decisions include the more immediate determinations to proceed with Northrop Grumman through the Option Period 2C+ phase of product development while simultaneously discontinuing Raytheon's participation in the GPI Program altogether.  According to Raytheon, these contemporaneous decisions effectively eliminate the company's ability to compete for the anticipated follow-on production contract reportedly worth billions of dollars.  Thus, at every turn, Raytheon makes non-frivolous claims of economic harm directly attributed to the allegedly flawed OT award decisions made by the MDA and follow-on consequences.[13]

---

[13] With respect to Raytheon's reliance upon the FY 2024 NDAA, the Court notes the following.  Defendant's argument that Raytheon lacks standing to enforce a congressional deadline on the MDA's development of a hypersonic missile defense system is well-taken.  *See Cleveland Assets, LLC v. United States*, 883 F.3d 1378, 1382 (Fed. Cir. 2018) (appropriations bills and riders are typically not interpreted as procurement statutes for purposes of adjudicating bid protests under the Tucker Act).  Nevertheless, as explained during oral argument, the Court can (and should) consider Congress' directive in assessing whether the MDA took the deadline into account in evaluating whether to proceed with Northrop Grumman and/or Raytheon.  *See* Tr. at 106–10 (Jan. 14, 2025) (ECF 55).

16

C. Exhaustion Requirement

Finally, defendant submits that Raytheon failed to adhere to the dispute resolution procedures included in the negotiated OTA, requiring exhaustion of administrative remedies prior to filing suit or seeking other legal redress. Specifically, Article 17 provides: "Any dispute between the Government and Performer concerning questions of fact or law arising from or in connection with this Agreement, and, whether or not involving an alleged breach of this Agreement, may only be raised under this Article." ECF 50-1 at 6–7. This provision then provides for a series of mandatory notices and documentation submissions, intermittent meet and confer requirements, and an escalating agency appeal process which, by this Court's calculation, would take six months or more to complete. *See id.* at 7. Defendant asserts that Raytheon's failure to satisfy the administrative precondition precludes the pursuit of this (or any other) legal action.[14]

In light of the Court's conclusion that Raytheon properly pled and filed this matter as a bid protest, defendant's reliance upon the mandatory dispute resolution procedures included in the OTA is misplaced. As Raytheon aptly notes, this Court has long held that exhaustion of administrative remedies, although a staple of CDA claims, cannot serve as a condition precedent to filing a bid protest. *Coastal Env't Grp., Inc. v. United States*, 114 Fed. Cl. 124, 132 (2013) ("There are no waiting periods or administrative exhaustion requirements for bid protests.") (citing 28 U.S.C. § 1491(b)); *Hawpe Constr., Inc. v. United States*, 46 Fed. Cl. 571, 576–77 (2000) ("Plaintiff's cause of action arises under the contracts and bid protest jurisdiction of the Tucker Act, 28 U.S.C. § 1491(b)(1)[], which does not require exhaustion of administrative remedies for post-award bid protests."); *see, e.g.*, *K-Lak Corp. v. United States*, 93 Fed. Cl. 749, 753–55 (2010) (rejecting government's administrative exhaustion requirement argument in case alleging viable bid protest); *cf. Darby v. Cisneros*, 509 U.S. 137, 154 (1993) (administrative exhaustion requirement inapplicable to APA cases). To hold otherwise would improperly subjugate this Court's Tucker Act jurisdiction to the will and whim of creative contract drafting. *See VanDesande v. United States*, 673 F.3d 1342, 1350 (Fed. Cir. 2012) (noting "the well-established rule that neither a court nor the parties has the power to alter a federal court's statutory grant of subject matter jurisdiction") (citing cases); *Sperient Corp. v. United States*, 113 Fed. Cl. 1, 6 (2013) ("[P]arties cannot affect a federal court's jurisdiction by contract") (citing cases).

---

[14] Under the terms of Article 17, Raytheon reportedly has up to 180 calendar days to administratively notify the MDA of any dispute under the other transaction agreement. *See* ECF 50-1 at 7. Adherence to this provision would afford Raytheon until March 24, 2025, to dispute the agency's September 25, 2024 decision to discontinue the company's participation in the GPI Program. According to the above-referenced timeline, exhaustion of the dispute resolution procedures could last through the fall of 2025.

17

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss (ECF 31) is DENIED. The parties shall FILE a joint status report on or before February 24, 2025, proposing a schedule of continued proceedings in this case, including the prompt filing of the administrative record and an expedited briefing schedule to resolve this matter on cross-motions for judgment on the administrative record.

It is so **ORDERED**.

_____
Armando O. Bonilla
Judge